**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 20 CR 505 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| NELSON PERKINS, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Defendant Nelson Perkins was charged with possession of a controlled substance with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm in furtherance of a drug trafficking crime in violation of 21 U.S.C. § 924(c)(1)(A). (Dkt. 9 at 1–2). These charges arose out of an encounter between Perkins and Chicago Police Department ("CPD") Officers on the morning of August 15, 2020 when officers responded to an anonymous 911 call reporting an individual, believed to be carrying a firearm, selling loose cigarettes and drugs at the currency exchange at the corner of 63rd and Morgan. (*Id.*). Officers subsequently stopped Perkins, searched his backpack, and found a firearm, marijuana, and drug distribution supplies. (*E.g.*, Dkt. 38-4 at 1:38). Perkins moved to suppress the items found in his backpack. (Dkt. 25). Perkins argues that the police lacked reasonable suspicion to subject him to a *Terry* stop, (*id.* at 5–11), and in the alternative, that even if the police had reasonable suspicion to support a *Terry* stop, the search of his bag exceeded the bounds of that stop. (*id.* at 11–13). For the reasons explained below, Perkins's Motion to Suppress [25] is granted.

## BACKGROUND

At 9:44 a.m. on August 15, 2020, an anonymous individual called 911 to report a man in the currency exchange at the corner of 63rd and Morgan selling cigarettes and drugs and who kept a firearm on him. (Dkt. 38-1 at 0:10–0:28). The caller reported that the suspect was a 6'3" light-skinned, black man wearing black shorts. (*Id.* at 0:21–0:45). The OEMC operator asked the caller whether he saw the suspect with a firearm that day, and the caller responded, "I seen him with one today. Yeah, he pulled it out on, on this lady." (*Id.* at 0:54–1:48). The OEMC operator pressed further saying, "I need to know if you saw this man with this gun today, right now, which is why you called 911?," and the caller stated, "Yeah, I seen him today with the gun. And that's why I called 911." (*Id.*). Finally, when asked whether he wanted to provide his name or remain anonymous, the caller asked to remain anonymous. (*Id.*).

At 9:48 a.m,, the OEMC operator summarized the call and sent out a flash message to police stating:

> M/B [male black] LIGHT COMPLX BLK SHORTS INSIDE OF CURRENCY EXCHANGE WITH GUN THAT C/S HE SAW ON HIM TODAY WHICH PROMPTED THE CALL AND HE'S SELLING LOOSE CIGARETTES AND HE THREATENS PEOPLE.

(Dkt. 28-1 at 2). Within two minutes, CPD Officers arrived at the currency exchange and found Perkins, who matched the physical description of the suspect, sitting in a chair in the lobby with a stack of money in his hand, a pack of Newport cigarettes on the table next to him, and a backpack sitting on the floor beside him. (*E.g.*, Dkt. 38-3 at 0:19). Shortly after arriving and telling Perkins that someone called 911 on him, an officer asked Perkins to step outside. (*See* Dkt. 38-2 at 0:41). Perkins complied with the officer's request and followed his directions. While Perkins brought the cash in his hand with him outside, he left his other belongings inside, including a backpack, a black trash bag, and several grocery bags. (*Id.*). At the time, there were two other individuals in

2

the currency exchange—one woman was at the window conducting business and one man who was looking at his phone.

Upon stepping outside, officers told Perkins that someone called 911 on him for selling loose cigarettes and carrying a firearm. (*Id.* at 0:59). Perkins responded by saying he had just arrived at the currency exchange. (*Id.* at 1:05, 1:13). An officer then conducted a pat-down of Perkins without finding anything on his person. (*Id.* at 1:22; Dkt. 38-3 at 1:19). That same officer then reentered the currency exchange, walked over to the corner where Perkins has been sitting, picked up his backpack and searched it. (Dkt. 38-3 at 1:40–2:03). The officer recovered a firearm and marijuana from the backpack. (*Id.* at 1:58; Dkt. 28 at 2). Shortly after, Perkins fled the parking lot of the currency exchange and attempted to escape the police. (Dkt. 38-3 at 2:12). He was caught in an alley, arrested, and charged with possession of marijuana with the intent to distribute and possession of a firearm in furtherance of a drug trafficking charge. (Dkt. 9 at 1–2).

## DISCUSSION

Perkins argues that the evidence of the firearm and marijuana must be suppressed. First, he argues that the responding officers did not have reasonable suspicion to conduct a *Terry* stop and that the evidence was therefore obtained through an unlawful seizure. (Dkt. 25 at 5). Second, he argues that even if the police had reasonable suspicion to conduct a *Terry* stop, the police did not have legal authority to search his backpack under *Terry*. (*Id.* at 11). The Government counters that police had reasonable suspicion to conduct a *Terry* stop and that the search of Perkins's backpack was lawful for three independent reasons: (1) Perkins abandoned his backpack by leaving it in the currency exchange when he stepped outside to speak with the police, (2) Perkins did not have a reasonable expectation of privacy in the backpack at the time of the search, and (3)

3

the police had probable cause to arrest Perkins and conduct an inventory search of his property. (Dkt. 28 at 2–3).

## I.     The Anonymous 911 Call and Reasonable Suspicion

Perkins first contends that the anonymous 911 call did not give rise to the reasonable suspicion necessary to support the officers' *Terry* stop. The reason, Perkins contends, is that the 911 call "was made by an anonymous caller who did not provide any predictive information that substantiated his allegation of criminal activity." (Dkt. 25 at 5). He further contends that "[t]he responding officers did not corroborate any of the allegations made in the call" upon arriving at the currency exchange. (*Id.*).

"[T]he Fourth Amendment permits law enforcement to conduct a brief investigative stop[,]" or *Terry* stop, "when an officer reasonably suspects a person is engaged in criminal behavior." *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019). The reasonable suspicion standard is "less than probable cause," which is necessary for an arrest, and "considerably less than preponderance of the evidence," *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (internal quotation marks omitted), but "requires more than an 'inchoate and unparticularized suspicion or hunch,'" *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). To determine whether reasonable suspicion existed, courts must consider the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotations and citation omitted). "Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." *Id.* (internal quotations and citation omitted). When a defendant challenges the validity of a *Terry* stop, the Government bears the burden of showing

4

that the officers had reasonable suspicion. *See United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

Under certain circumstances, anonymous 911 calls can give rise to the reasonable suspicion necessary to conduct a *Terry* stop. However, because anonymous tips " 'seldom demonstrate[ ] the informant's basis of knowledge or veracity,' they <u>alone</u> usually are not reliable enough to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (emphasis added) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000). The Supreme Court has identified "three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *Watson*, 900 F.3d at 895 (citing *Navarette v. California*, 572 U.S. 393, 398–401 (2014)).

Here, the anonymous 911 caller reported an individual who "keeps a gun on him" selling loose cigarettes and drugs in the currency exchange. (Dkt. 38-1 at 0:10–0:28). The 911 Operator attempted to determine whether there was an immediate situation for the officers to respond to: "Okay, so do you know if he has it on him now in the currency exchange? To which the anonymous caller responded, "He done put, he done put . . ." The 911 Operator pressed him to determine again if there is an immediate situation: "I need to know whether you saw this man with this gun today, which is why you called 911?" The caller responded, "I seen him today with the gun. And that's why I called 911." (*Id.* at 0:54–1:48).

Perkins correctly points out that the anonymous caller used the past tense in describing seeing the suspect with a gun, suggesting that the call was *not* made contemporaneously. (*See* Dkt. 38-1 at 0:57, 1:11). In his report to 911, the caller referred to the defendant's past behavior and his complaint sounded similar to a complaint of criminal activity occurring on a regular basis in

the currency exchange as opposed to an emergent situation. ("And uh, uh, he's in there posted up every day selling. And it's been going on for a long time and you know it just don't make no sense." Earlier he stated, "people in there allow him to do it."

Nor did the caller provide contemporaneous information of the sale of drugs or loose cigarettes. He did not, for example, state that he just observed a drug sale to a man; or a cigarette sale to a woman; or the exchange of something for cash. Instead, the caller gave a brief description and then refused to give his name.

Although the anonymous caller used the 911 emergency system, which permits call tracing and recording of the conversation, this mechanism did not help to corroborate the information. When the officers arrived on the scene, they did not observe anything that corroborated the caller's report other than the general description of a light-skinned black man in shorts. They did not observe any transactions occurring; no hand-to-hand exchanges; no one brandishing a firearm; no loose cigarettes; and certainly nothing out of the ordinary at the currency exchange while one customer transacted business with an employee behind the counter.

The Supreme Court's decision in *Florida v. J.L.*, 529 U.S. 266 (2000) is instructive. There, police received an anonymous tip about a young black male wearing a plaid shirt and allegedly carrying a gun at a bus stop. *Id.* at 268 (further noting that the government had no audio recording of the tip and "nothing [was] known about the informant"). Officers arrived at the bus stop approximately six minutes later and found an individual – J.L. – who matched the physical description provided in the tip. *Id.* However, J.L. was not seen with a gun and "made no threatening or otherwise unusual movements." *Id.* In other words, the officers had no reason to suspect criminal activity aside from the anonymous tip. *Id.*; *see also id.* at 270 ("[T]he officers'

6

suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller.").

The Court held that these circumstances did not give rise to reasonable suspicion to conduct a *Terry* stop because the anonymous tip lacked "sufficient indicia of reliability." *Id.* at 271; *contra id.* at 270 (explaining that anonymous tips corroborated by predictive information, such as an accused's future movements, may establish reasonable suspicion (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)). As the Court explained:

> The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. . . . All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. . . . [Reasonable suspicion] requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Florida v. J.L.*, 529 U.S. at 271. *Florida v. J.L.* is nearly indistinguishable from the present case. Here, police received an anonymous 911 call making various allegations against a suspect matching Perkins's description. (*E.g.*, Dkt. 28 at 3–6). Officers subsequently found Perkins sitting in a currency exchange. (*See generally* Dkt. 38-5). Perkins was not seen with a gun, made no "threatening or unusual movements," and otherwise simply kept to himself. (*Id.*). There was no reason to suspect that criminal activity was afoot given these facts beyond the anonymous tip identifying Perkins as a suspect.

The Government nonetheless argues that the tip "was sufficiently corroborated and reliable to create reasonable suspicion of ongoing criminal activity" – namely, suspicion that Perkins was armed and selling drugs and/or loose cigarettes. (Dkt. 28 at 7, 19). For this, the Government first notes that Perkins "had a stack of U.S. currency in his hand that was folded over and secured with a rubber band." (*Id.* at 7). Not only does this fact simply

7

fail to suggest criminal activity, but Perkins was found waiting in a *currency exchange* – where it would be completely in keeping with lawful conduct for someone to be found holding money. Next, the Government cites that Perkins had a pack of Newport cigarettes within arm's reach. (*Id.*). This alone fails to corroborate the tip, however, because Perkins was not observed *selling* those cigarettes or interacting with anyone in the building. *See, e.g.*, *Watson*, 900 F.3d at 896–98 (holding that a tip did not establish reasonable suspicion of a crime where "what [the officer] saw did not match the caller's report;" "[i]f there had been a potential emergency at the time of the call, it no longer existed when the police arrived").

Upon arriving at the scene and not observing any criminal activity, the officer approached Perkins and told him that someone had called 911 on him and asked him to step outside. The currency exchange is a one room storefront with full glass windows from the street. Perkins complied and answered their questions. The officers conducted a pat-down and did not find any weapons or contraband. They also appear to express doubt about the 911 caller's report during this interaction – asking Perkins whether he "has beef" with anyone. (Dkt 58-3 at 1:10–15). Based on the lack of corroboration of an anonymous, non-contemporaneous tip, the officers' pat-down was tenuous and most-likely unsupported by *Florida v. J.L.* Yet, even if the *Terry* Stop could be justified, the search of the backpack cannot.

## II.    The Search of Perkins's Backpack

Under the Fourth Amendment, a police officer may conduct a frisk – a limited pat down of the suspect's outer clothing to search for weapons – only "if the police officer can 'point to specific and articulable facts' indicating 'that criminal activity may be afoot <u>and</u> that the persons with whom he is dealing may be armed and presently dangerous.' " *United States v. Howell*, 958 F.3d

589, 598 (7th Cir. 2020) (emphasis added) (quoting *Terry*, 392 U.S. at 21, 24–25, 30). "This limited protective search may include a pat-down of the suspect's effects, including a bag." *United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015) (citations omitted). However, a warrantless search of a suspect's effects exceeds the bounds of *Terry* when the suspect is separated from his effects and there is no reasonable belief that the suspect can gain "immediate control" of them. *See id.*

Here, the Government does not contest that Perkins was separated from his backpack at the time police searched it. Since he was not within reach of the backpack, they certainly could not claim the risk of him accessing a firearm during the stop. The video evidence plainly shows that Perkins was speaking to police outside the currency exchange when an officer went inside and searched his backpack. (Dkt. 38-3 at 1:38, 2:10). Instead, the Government argues that the search of the backpack was valid on three other grounds: (1) Perkins abandoned his Fourth Amendment interest in the backpack by leaving it in a public place where he had no reasonable expectation of privacy; (2) Perkins relinquished any reasonable expectation of privacy he had in the backpack by leaving it unattended in a place of business with other customers around; and (3) police had probable cause to arrest Perkins for selling loose cigarettes and do an inventory search of his property. (Dkt. 28 at 19–20). These arguments are addressed in turn.

### A. Abandonment of Fourth Amendment Interest in Backpack

The Government first argues that Perkins implicitly abandoned his backpack, thereby granting the police authority to search it. (*Id.* at 20–21). "Abandoned property is not subject to Fourth Amendment protection." *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) (quoting *Abel v. United States*, 362 U.S. 217, 241 (1960)). "To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the

9

defendant relinquished his property interests in the item to be searched." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003) (citing *Basinski*, 226 F.3d at 836). In determining whether a defendant abandoned their property, courts "look at the totality of the circumstances, but pay particular attention to *explicit denial of ownership* and to any physical relinquishment of the property." *Basinski*, 226 F.3d at 836 (emphasis added) (citations omitted).

The Government argues that Perkins implicitly abandoned his property by "distancing himself from [his backpack] throughout his encounter with police," "pointing to the plastic shopping bags on the counter next to his chair (but not the backpack)" after telling police that he "just sat down," and leaving his backpack inside when asked by the police to step outside. (Dkt. 28 at 20–21). However, the facts of this case are distinguishable from previous cases in which courts found that a defendant abandoned their property. *E.g.*, *United States v. Maclin*, 313 Fed. App'x 886, 888 (7th Cir. 2009) (holding defendant abandoned gun by dropping it during a police chase); *see also, e.g.*, *United States v. Witten*, 649 Fed. App'x 880, 885 (11th Cir. 2016) (concluding defendant abandoned backpack by hiding it under the porch of another person's house and then telling police his backpack was at home). Here, Perkins never expressly disclaimed ownership over his backpack, as the Government concedes. (Dkt. 28 at 20 ("Perkins did not expressly deny that the backpack belonged to him (as in many abandonment cases addressed by the circuit).")). Moreover, his backpack sat next to his chair throughout his initial encounter with the police – he made no effort to hide or otherwise dispose of it. (*See* Dkt. 38-5 at 0:21–0:44).

Most importantly, Perkins only left his backpack behind after being asked by the police to step outside. (*Id.* at 0:44). Perkins was always within eyesight of the backpack which could clearly be seen through the plate glass windows. Further, there were only two other individuals in the currency exchange at the time the police arrived (the female customer appears to have left by the

time the police are questioning Perkins outside) and both would need to exit the same door that Perkins and the police exited. In fact, from the photos presented to the Court, if one of the individuals picked up his backpack to remove it from the chair where he left it, he would be able to assert control over it again. He also would be able stop either of the individuals from removing the backpack because they would need to walk within feet of him to get out with it. It cannot be said under those circumstances that Perkins abandoned his property. He left it where he could see it and where he could still exercise control over it. He did not leave it in a public area with high levels of traffic; he left it approximately twenty feet from him. The Government has not produced any legal support for its claim that an individual abandons their property when they comply with an officer's request to step away from their effects. (See Dkt. 28 at 20–21). Perkins did not abandon his backpack prior to the search.

**B.      Reasonable Expectation of Privacy in Backpack**

The Government next argues that even if Perkins did not abandon his property, he did not have an objectively reasonable expectation of privacy in the backpack at the time of the search. (Dkt. 28 at 21). In determining whether an individual has a legitimate privacy interest in a given piece of property, courts in the Seventh Circuit consider five factors:

> (1) whether the defendant had a possessory [or ownership] interest in the thing seized or the place searched, (2) whether he had the right to exclude others from that place, (3) whether he exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether he took normal precautions to maintain his privacy, and (5) whether he was legitimately on the premises.

*United States v. Carlisle*, 614 F.3d 750, 758 (7th Cir. 2010) (citing *United States v. Peters*, 791 F.2d 1270, 1281 (7th Cir. 1986)).

The government challenges the fourth factor – arguing that Perkins did not take normal precautions to maintain his privacy. (Dkt. 28 at 22). It maintains that Perkins failed to take such precautions when he left the backpack inside the currency exchange, where there were "multiple

people . . . who could have accessed [it] when he stepped away." (*Id.*). However, the video evidence shows that there were only two people in the currency exchange lobby throughout the police encounter. (*See generally* Dkt. 38-5 (showing that during the entire relevant period, only one person was interacting with a store clerk at the currency exchange, no one else was in line, and no one entered or exited the building besides Perkins and the police); *see also* Dkt. 38-4 at 1:11 (showing one individual sitting in the currency exchange lobby, on the opposite side of the building from where Perkins was sitting with his belongings)). The government's contention that Perkins failed to maintain privacy in his backpack simply by "leaving [it] behind in a place of business" is unavailing since Perkins only left his backpack in the building when he was ordered to step outside. Even then, he was within a direct line of sight with his property. Perkins left his bag unattended for less than two minutes before the officers conducted their search. (*See* Dkt. 38-3 at 0:35 (showing Perkins being ordered to step outside), 1:50 (showing Perkins's bag being searched just over one minute later), 2:10 (showing Perkins still standing just outside the currency exchange talking to police)). In other words, this is not a case where Perkins left his backpack in a public space for such an extended period of time that no reasonable person would expect it to be left untouched.

The evidence otherwise shows that Perkins took normal precautions to maintain his privacy in the backpack. Perkins had his backpack zipped closed and placed in the back corner of the building's lobby. (*E.g.*, Dkt. 38-5 at 1:38–45 (showing an officer picking up Perkins's bag from the floor, where it was placed between Perkins's chair and in the shadow of a machine); Dkt. 38-3 at 1:50–55 (showing body camera footage of an officer unzipping Perkins's bag)). By contrast, for instance, Perkins did not leave his bag unzipped or in an area with high foot traffic, which would undercut his expectation of privacy in a public setting. Further, the video evidence

12

demonstrates that the area where Perkins placed his backpack remained within his line of sight as he stood outside. (*See, e.g.*, Dkt. 38 at 12 (showing a still image of body camera footage from the vantage point of where Perkins left his bag, demonstrating that Perkins was in view of that corner of the room while standing outside)). Perkins had a reasonable expectation of privacy in his backpack at the time of the search.

### C. Probable Cause to Arrest Perkins and Conduct Inventory Search of the Backpack

Finally, the Government asserts that the police had probable cause to arrest Perkins for selling loose cigarettes in violation of Chapter 4-64-350(a) of the Chicago Municipal Code and conduct an inventory search of his property. (Dkt. 28 at 23). As an initial matter, even if the police's initial questioning and detaining of Perkins could be justified under *Terry*, that does not mean that the police had probable cause to arrest Perkins. An officer has probable cause to arrest "if he has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime." *Gonzalez v. Village of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) (citing *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). "[P]robable cause deals not with hard certainties but with probabilities." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013) (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Probable cause is ultimately a "fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015) (quoting *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005)).

The officers did not have probable cause to arrest Perkins for selling loose cigarettes at the time of the search. Prior to searching Perkins's backpack, the officers knew that a 911 caller

reported that an individual who potentially possessed a firearm was selling loose cigarettes at the currency exchange. The police also knew that Perkins matched the suspect's description, was sitting in the lobby of the currency exchange, and had cash and a pack of Newport cigarettes next to him. (Dkt. 28 at 23–24). However, in their short encounter, the police never observed Perkins interact with any other person, engage in any apparent transaction, market cigarettes, or manage an inventory of cigarettes. (Dkt. 30 at 23). In fact, they never observed loose cigarettes. Perkins's behavior was more in keeping with lawful than criminal activity under these circumstances. Although "probable cause only requires a substantial chance of criminal activity, not an actual showing of such activity," *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003), the evidence here is insufficient to find probable cause. *See Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992) (concluding that "the existence of hand-rolled cigarettes alone did not create probable cause for an arrest"); *see also, e.g.*, *Tucker v. Torres*, No. 16-cr-2480, 2018 WL 6045217, at *3 (N.D. Ill. Nov. 19, 2018) (denying summary judgement in section 1983 case because a reasonable jury could find that observing a one-way, hand to hand transaction was *not* sufficient to create probable cause regarding selling loose cigarettes). Based on these facts, it is questionable that the officers had reasonable suspicion to stop Perkins and investigate the situation. However, once they conducted the pat-down and did not find evidence supporting the anonymous tip, they had no right to seize his private property and search it. It is noteworthy also, that the officers made no effort to corroborate the tip themselves before seizing the property. They did not interview the employee, the customers, or even sit outside and conduct surveillance through the glass windows once they arrived and did not see any criminal activity in the currency exchange. *See, e.g.*, *Watson*, 900 F.3d at 896 (explaining that "police have options other than an instant *Terry* stop," including observing the scene of an alleged crime, which could "transform an innocuous tip into reasonable

suspicion"). Police did not have probable cause to arrest Perkins and conduct an inventory search of his backpack. Therefore, the search of Perkins's backpack was a violation of Perkins's Fourth Amendment rights and contents must be suppressed.

## **CONCLUSION**

For the reasons stated, Perkins's motion to suppress [25] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: February 3, 2022

15